IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHELLE LARSON,

          Plaintiff,

      v.                              No. 01:13-CV-00659-HZ

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,          OPINION & ORDER

          Defendant.

Martin R. Cohen
P.O. Box 1229
4040 Douglas Way
Lake Oswego, Oregon 97035

Linda S. Ziskin
P.O. Box 753833
Las Vegas, Nevada 89136

      Attorneys for Plaintiff

/ / /

/ / /

1 - OPINION & ORDER

S. Amanda Marshall
UNITED STATES ATTORNEY
District of Oregon
Ronald K. Silver
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97210-2902

Thomas M. Elsberry
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Michelle Larson brings this action seeking judicial review of the Commissioner's

final decision to deny disability insurance benefits (DIB) and supplemental security income

(SSI).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. §

1383(c)(3)).  I affirm the Commissioner's decision.

## PROCEDURAL BACKGROUND

      Plaintiff applied for DIB and SSI on December 10, 2009, alleging an onset date of

February 3, 2009.  Tr. 145-51, 152-55.  Her application was denied initially and on

reconsideration.  Tr. 67-74, 76-84, 86-87.

      On December 7, 2011, Plaintiff appeared, with counsel, for a hearing before an

Administrative Law Judge (ALJ).  Tr. 34-55.  On December 23, 2011, the ALJ found Plaintiff

not disabled.  Tr. 14-32.  The Appeals Council denied review.  Tr. 1-5.

/ / /

2 - OPINION & ORDER

FACTUAL BACKGROUND

Plaintiff alleges disability based on depression and low back pain.  Tr. 184.  At the time

of the hearing, she was forty-seven years old.  Tr. 38.  She completed ninth grade and has past

relevant work in sales.  Tr. 25.  Because the parties are familiar with the medical and other

evidence of record, I refer to any additional relevant facts necessary to my decision in the

discussion section below.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which . . . has lasted or can be

expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§

423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  See Valentine v.

Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step

procedure to determine disability).   The claimant bears the ultimate burden of proving disability.

Id.

In the first step, the Commissioner determines whether a claimant is engaged in

"substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S.

137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner

determines whether the claimant has a "medically severe impairment or combination of

impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the

claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in

3 - OPINION & ORDER

combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. Tr. 19. Next, at steps two and three, the ALJ determined that Plaintiff has severe impairments of mild degenerative disc disease of the lumbar spine, obesity, depression, post-traumatic stress disorder, and alcohol abuse in remission, but that the impairments did not meet or equal, either singly or in combination, a listed impairment. Tr. 19-21.

At step four, the ALJ concluded that Plaintiff has the residual functional capacity (RFC) to perform light work, meaning she can lift and/or carry 20 pounds occasionally and 10 pounds frequently, that she can stand and/or walk, with normal breaks, 6 hours in an 8-hour day, and sit,

with normal breaks, 6 hours in an 8-hour day. Tr. 21. Additionally, she can never climb ladders, ropes, or scaffolds, although she can occasionally climb ramps and stairs, and can occasionally balance, stoop, kneel, crouch, and crawl. Id. She should avoid even moderate exposure to unprotected heights, walking on uneven terrain, and even moderate use of moving machinery. Id. In addition, she is limited to simple, routine, repetitive work involving only simple work-related decisions and routine workplace changes. Id. Finally, she is limited to a stress level of no more than 8 on a scale of 10, and will be off-task for 5 minutes out of every hour. Id.

With this RFC, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. Tr. 25. However, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as housekeeping cleaner, "marker II," and advertising-material distributor. Tr. 26-27. Thus, the ALJ determined that Plaintiff is not disabled. Tr. 27.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." Vasquez, 572 F.3d at 591

(internal quotation marks and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149,

1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the

court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

DISCUSSION

Plaintiff argues that the ALJ improperly rejected the opinions of her treating physicians,

failed to consider adverse side effects of her medications, and improperly rejected the testimony

of a lay witness.

I. Treating Physician Opinions

Plaintiff's February 3, 2009 alleged onset date was the date she was in an automobile

accident in which her boyfriend was killed.  Shortly thereafter, she began treating with

Physician's Assistant (PA) Jinny Farrar at the Park Street Clinic in Lebanon, Oregon for

complaints of back pain and depression, both related to the accident.  Tr. 335-403 (showing

treatment records from February to June 2009).

As part of her care there, she had a lumbar x-ray taken on February 17, 2009 which

showed a curvature of the spine convex to the left, which was thought to be due to scoliosis or

spasm.  Tr. 396.  There were no acute fractures.  Id.  Mild degenerative disc disease was present

at the L3-4 vertebrae.  Id.  On February 20, 2009, PA Farrar examined Plaintiff who reported

emotional distress and depression and severe back pain.  Tr. 391.  On physical examination, PA

Farrar found spinal tenderness throughout Plaintiff's lower back bilaterally, and point tenderness

over her lower spine.  Tr. 393.  Plaintiff had a decreased range of motion in all directions due to

pain with positive sitting and lying leg raises bilaterally.  Id.  PA Farrar diagnosed Plaintiff as

having a lumbar back strain, possibly due to muscle spasm, and depression and anxiety.  Tr. 394.

6 - OPINION & ORDER

She referred Plaintiff to physical therapy, prescribed Vicodin and Percocet, as well as ibuprofen, and also started her on an antidepressant medication. Id. She also prescribed lorazepam as needed for anxiety issues or as needed for sleep. Id.

Plaintiff saw PA Farrar until June 2009 when Plaintiff moved to Reedsport. Tr. 341-89. Plaintiff continued to complain of back pain throughout this time, as well as depression. Id. At one point, Plaintiff complained of cervical pain and headaches, prompting PA Farrar to refer Plaintiff for a cervical MRI which showed only moderate abnormalities. Tr. 367-68. PA Farrar referred Plaintiff to a neurologist who noted on April 9, 2009 that Plaintiff's upper extremity symptoms had improved with physical therapy and that the cervical MRI showed some degenerative type changes. Tr. 359-62. The neurologist recommended she obtain a lumbar back MRI to rule out a disc injury. Tr. 361. That test, performed April 13, 2009, showed only mild degenerative disc disease. Tr. 354-55.

Although Plaintiff continued to complain of low back pain during her treatment with PA Farrar, she also made the following reports: (1) on February 26, 2009, she reported that Percocet was helping but she still was tightening up with knots and wanted something else for the pain; Tr. 382; (2) on April 10, 2009, she reported that her depression had improved with Prozac but she still had no improvement with her back.; Tr. 356; and (3) on May 4, 2009, she reported that in regard to her back, she continued to improve, but very slowly, and that her Prozac was working well for her depression. Tr. 347.

During this time, Plaintiff was receiving physical therapy beginning in early March 2009. Tr. 378-79. Initially, the physical therapist noted that in static standing, Plaintiff's left hip was higher than her right and that her gait was antalgic with the trunk forward flexed about 10

7 - OPINION & ORDER

degrees and decreased at length bilaterally. Tr. 378. All of her trunk active range of motion was limited by pain. Tr. 378. On April 8, 2009, the physical therapist reported that Plaintiff was progressing slowly, but consistently. Tr. 363. Her lumbar active range of motion had improved. Id. On May 5, 2009, Plaintiff reported to the physical therapist that she continued to progress and noted more rapid improvements during the previous two weeks. Tr. 345.

During her treatment of Plaintiff, PA Farrar periodically certified to State Farm Insurance that the February 3, 2009 car accident caused Plaintiff acute muscle strain and pain which in turn prevented Plaintiff from performing household chores. Tr. 397-98 (for period of February 20, 2009 to March 13, 2009); Tr. 369-70 (for period of February 20, 2009 to April 10, 2009); Tr. 350-51 (for period of February 20, 2009 to May 8, 2009); Tr. 340 (for month of May 2009). However, by May 4, 2009, PA Farrar stated that there was no indication from Plaintiff's MRIs, x-ray, or neurology consult of anything supporting disability. Tr. 349. PA Farrar encouraged Plaintiff to continue with movement and to begin doing daily chores. Id. Given Plaintiff's continued reports of pain, PA Farrar agreed to refill Plaintiff's pain medication and muscle relaxant prescriptions for one more month, but after that she would have to be evaluated by a physiatrist. Tr. 349. PA Farrar reassured Plaintiff that although muscle strains were slow to heal, they do improve with proper exercise, stretching, and a positive outlook. Id.

After moving to Reedsport in June 2009, Plaintiff established care in July 2009 with Dunes Family Healthcare, primarily being seen by Jianming Song, M.D., and Rio Lion, D.O. At her initial visit with Dr. Song, Plaintiff complained of excruciating lumbar pain for which she was taking Percocet. Tr. 304. She reported that the Percocet upset her stomach and did not provide enough relief. Id. Dr. Song replaced the Percocet with tramadol, amitriptyline, and

Flexeril.  Id.  He referred her to Dr. Rossi at the "Family Resource Center" for problems with her depression and noted that he would consider increasing her Prozac in the future if needed.  Tr. 305.

Throughout the rest of 2009, Plaintiff occasionally saw Dr. Song who noted in September 2009, that Plaintiff reported that her depression had improved somewhat, but was not sufficiently controlled.  Tr. 307.  She requested an increase in her Prozac dose.  Id.  Dr. Song increased her dose from 20 to 40 milligrams daily.  Id.  As for her back, he indicated that her pain was secondary to mild degenerative disc disease and he advised her to use cold/warm packs for 10-20 minutes, 2-3 times per day.  Id.  He recommended over-the-counter ibuprofen or Tylenol, and prescribed amitriptyline, tramadol, and Flexeril.  Id.  At her request, he referred her to a pain specialist, Dr. Croson.  Id.  On October 26, 2009, Plaintiff had another set of lumbar spine x-rays which showed only mild degenerative changes with no acute findings.  Tr. 303.

In November 2009, Dr. Song noted that Plaintiff had recently received a cortisone injection from Dr. Croson which seemed to cause an increase in pain symptoms.  Tr. 306.  Dr. Song gave her an injection of Toradol and a handout of exercises designed to decrease leg pain. Id.  He urged her to follow up with Dr. Croson.  Id.  However, later in November, she called Dr. Song's office to complain that treatment with Dr. Croson was not working and she wanted to see someone else.  Tr. 308.  A November 25, 2009 chart note indicates that a pain specialist in Eugene would call her to make an appointment but there is no record of her having seen a Eugene pain specialist.  A separate chart note entered by Dr. Song and dated December 14, 2009, states that Dr. Croson referred her to see Dr. Chung, a pain specialist in North Bend, to consider nerve stimulation treatment.  Tr. 309.  No record of treatment with that provider is found in the

9 - OPINION & ORDER

Administrative Record.  Id.

During that December 14, 2009 office visit, Dr. Song noted that Plaintiff's lower back x-rays and MRI were unremarkable.  Tr. 309.  He also noted that Plaintiff reported that her depression had improved on the increased dose of Prozac and assessed her depression and post-traumatic stress disorder as controlled.  Id.  He indicated that she had no loss of muscle strength or sensation and that she could ambulate by herself but had a hesitant gait.  Id.  He kept her on the tramadol and Flexeril for pain, and added oxycodone if necessary.  Id.  He gave her another Toradol injection.  Id.  He encouraged her to see Dr. Chung, the pain specialist.  Id.

Plaintiff also continued with physical therapy in Reedsport.  At her first physical therapy appointment on July 23, 2009, she complained that every activity increased her back pain, and that she experienced pain with prolonged sitting, standing, and walking.  Tr. 301.  Her strength was within normal limits in both upper and lower extremities although she had some lumbosacral pain with resistance to right and left hip flexion.  Id.  She had a guarded gait.  Tr. 302.  As part of her physical therapy, Plaintiff did pool exercises and received heat treatments from July to October 2009.  Tr. 326-334.  In August 2009, she received a TENS unit and reported doing well with that.  Tr. 331.  However, an undated physical therapy note refers to Plaintiff having severe pain, being followed in a pain clinic, and being discharged from physical therapy.  Tr. 320.

In 2010, Plaintiff began treating with Dr. Lion, an osteopathic physician in practice with Dr. Song at Dunes Family Healthcare.  Tr. 436.  Her first appointment with Dr. Lion was February 10, 2010, at which Plaintiff reported experiencing "lots of knots" in her back since the February 3, 2009 car accident.  Id. She reported that the pool therapy she did with physical therapy had been beneficial, but she stopped going after what she characterized as her adverse

reaction to the treatment she received from pain specialist Dr. Croson.  Id.  She also reported that

heat and the TENS unit helped occasionally.  Id.  Upon physical examination, Dr. Lion noted a

normal gait and found no significant vertebral point tenderness but did remark on significant

spasticity in the paravertebral musculature in the right lumbosacral region which was tender to

palpation.  Id.  There was also bilateral hamstring tightness.  Id.  Dr. Lion opined that Plaintiff's

depression went "hand in hand" with her low back pain, meaning her unwillingness "to let her

guard down" and process her emotions was "playing a role" in her persistent low back pain.  Id.

He noted her normal MRIs and x-rays.  Id.

Dr. Lion performed osteopathic treatment to Plaintiff at this visit which included gentle

soft tissue myofascial release and heat.  Id.  He anticipated a "slow but gradual process."  Id.  He

referred her to physical therapy to resume the pool exercises and instructed her to walk thirty

minutes per day.  Id.  He also referred her to Dr. Rossi at the Family Resource Center, as Dr.

Song had previously done, for counseling.  Id.

On March 1, 2010, Plaintiff reported to Dr. Lion that she had not followed through on his

referrals to Dr. Rossi or to physical therapy because she had developed a tooth infection.  Tr. 437.

She reported feeling "mostly the same" in regard to her back and "maybe somewhat . . . a little

better" in regard to her depression.  Id.  Dr. Lion performed more heat treatment and soft tissue

myofascial release.  Id.  He gave her some exercises and encouraged her to walk and follow

through with his previous recommendations.  Id.  Later that month, when Plaintiff saw Dr. Lion

again, she reported she had experienced a little pain relief from her last treatment, indicating that

she was no worse and overall, was slightly improved.  Tr. 434.  She still had not followed

through with Dr. Rossi.  Id.  During the visit, Dr. Lion performed more osteopathic treatment and

11 - OPINION & ORDER

taught Plaintiff range of motion techniques and other exercises.  Id.

At her next visit, on March 17, 2010, Plaintiff remarked that while she felt better initially after an osteopathic treatment, she did not believe she had experienced any real changes since starting manipulation. Tr. 435.  She stated that she was doing the exercises which she thought were helping her loosen up, but her pain seemed about the same, and even slightly worse that particular week.  Id.  She reported feeling significantly depressed but expressed resistance to seeing Dr. Rossi because, she explained, she does not like to talk about her problems.  Id.  She was experiencing significant stress waiting for a determination on her social security disability application.  Id.  Dr. Lion noted increased spasticity in her left paravertebral musculature of the thoracolumbar region and increased somatic dysfunction in the right sacroiliac region.  Id.  Dr. Lion provided more osteopathic treatment and Plaintiff received a Toradol injection. Tr. 433.  In response to Plaintiff's complaint that tramadol was making her feel sleepy, he stopped that prescription and started salsalate for pain, in additional to the oxycodone she was already receiving.  Id.

On March 26, 2010, Plaintiff reported to Dr. Lion that her pain was worse and seemed to coincide with the denial of her disability application. Tr. 432.  This was also contributing to her depression.  Id.  She still believed her depression medications were helpful.  Id.  She contacted Dr. Rossi and determined she could not afford counseling.  Id.  She tried marijuana for her pain which she reported helped, allowing her to get a good night's sleep and to go without oxycodone for two to three days.  Id.  She noted she intended to start pool therapy again.  Id.

On physical examination, Dr. Lion continued to find tenderness, but noted that her straight leg raise was negative and the flexibility of her hamstrings was improving.  Id.  He

performed some osteopathic treatment in his office and discussed various stretching and

strengthening exercises for her to pursue including walking.  Tr. 430.  Dr. Lion noted that he

filled out disability forms for Plaintiff.  Id.  He opined that her back pain had an "organic

etiology" based on the car accident and that she had "significant signs of somatic dysfunction."

Id.  He also believed this was strongly related to her post-traumatic stress disorder and depression

which he felt was not controlled.  Id.  He believed she would benefit from psychiatric help and

counseling.  Id.  Due to her back pain, he opined that she was unable to stand, walk, or sit for

more than 20 minutes at a time, unable to lift anything heavier than 10 pounds, although she

could lift less than 10 pounds occasionally, and needed to avoid any type of bending and lifting.

Id.

      Dr. Lion completed two forms on March 26, 2010, assessing Plaintiff's physical and

mental functional capacities.  Tr. 488, 489.  As to her physical capacities, he stated that she

could stand or walk a total of 0-2 hours in an eight hour day, and could sit a total of 0-2 hours in

an eight hour day.  Tr. 488.  She could occasionally lift less than 10 pounds, could occasionally

to rarely lift 10 pounds, could rarely lift 20 pounds, and could never lift 50 pounds.  Id.  She

could occasionally finger, grasp, and handle, and could never stoop/bend or crouch.  Id.  She

would frequently experience pain severe enough to interfere with the attention and concentration

required to perform simple work tasks.  Id.  In a section of checkboxes, he cited her signs and

symptoms as impaired sleep, substance dependence, depression, anxiety, muscle weakness, and

reduced range of motion.  Id.  Finally, he indicated that Plaintiff's impairments would cause her

to miss work more than four days per month.  Id.

      As to her mental functional capacity, he answered "yes" to the question of whether

13 - OPINION & ORDER

Plaintiff had a low IQ or reduced intellectual functioning, but noted that this was per Plaintiff's report and that he had performed no IQ testing. Tr. 489. He checked "yes" to the question of whether Plaintiff's psychiatric condition exacerbated her pain, explaining that her pain and depression go "hand in hand" because her condition increases her pain perception and makes pain management more difficult. Id. He repeated his opinion that her impairment would cause her to miss more than four days per month. Id. He assessed her as markedly impaired, which was defined as unable to function for more than one-third of the work day, in her activities of daily living, in her ability to maintain social functioning, and in her ability to maintain concentration, persistence, and pace, and indicated that she had "marked" episodes of decompensation. Id.

Also on March 29, 2010, Plaintiff saw Dr. Song again. Tr. 431. He remarked that her depression was uncontrolled because her "Zung depression score" in the clinic that day was 68 which he stated was an indication of severe depression. Id. The scoring sheet shows this to be the "Zung Self-Rating Depression Scale," meaning it is a subjective report of symptoms completed by Plaintiff. Tr. 492. The record does not contain information about how the total scale correlates to a particular level of depression. In response to her score, Dr. Song increased her Prozac from 40 to 60 milligrams each day as well and continued her on Trazodone and amitriptyline. Tr. 431.

On that same date, Dr. Song completed the same physical and mental capacities assessments that Dr. Lion completed a few days previously. Tr. 490-91. His assessments were similar to Dr. Lion's. Compare Tr. 288-89 with Tr. 490-91. In response to the question on the mental functional capacity assessment regarding whether Plaintiff had a low IQ or reduced intellectual functioning, Dr. Song responded "unknown," and explained that Plaintiff apparently

14 - OPINION & ORDER

had difficulty in thinking and concentrating and sometimes was forgetful. Tr. 491.

Plaintiff saw Dr. Lion again on April 19, 2010. Tr. 429. She reported that all of her problems continued and expressed stress over her lack of money and disability denial. Id. Dr. Lion went through disability paperwork with her, for a second time, and referred her to Dr. Song, whom Dr. Lion characterized as Plaintiff's primary physician, to complete medical marijuana program paperwork. Id.

Dr. Lion completed another set of physical and mental functional capacities assessments on April 19, 2010. Tr. 458-67. These were co-signed by Dr. Song. Id. As to her physical limitations, he again stated that she could sit for 0-2 hours in an 8-hour day and could stand/walk for 0-2 hours in an 8-hour day. Tr. 459. He noted that it would be necessary or medically recommended that she not sit continuously in a work setting. Id. She could occasionally lift less than 10 pounds, rarely lift 10-20 pounds, and never lift 50 pounds. She has significant limitations in repetitive reaching, handling, fingering, or lifting. Id. Her condition interferes with her ability to keep her neck in a constant position. Id. Dr. Lion further stated that Plaintiff could not engage in a full-time competitive job that requires activity on a sustained basis and that she had psychological limitations that affected her ability to work such a job. Tr. 460. She could perform no stooping, no kneeling, and no bending. Id. He opined that emotional factors contributed to the severity of her symptoms and functional limitations, but he indicated she was not a malingerer. Id. He believed she was capable of tolerating low work stress. Id. As the basis for his conclusion, he cited her need for multiple prescriptions to help her function and her dependence on medication. Tr. 460. He stated that Plaintiff's impairments or treatment would cause her to miss work more than three times per month. Tr. 461 In the section for additional

15 - OPINION & ORDER

comments, he noted that since the accident, she had suffered back pain, depression, and post-traumatic stress disorder and that "[t]his" would be an "ongoing process[.]"  Id.  He remarked that at this time, she was unable to "tolerate additional simple stressors and [activities of daily living] required at a regular job."  Tr. 461.

As to her mental functional capacity, Dr. Lion checked seventeen different signs and symptoms Plaintiff was experiencing and rated her as unable to meet competitive standards in fifteen of sixteen abilities and aptitudes required to perform unskilled work.  Tr. 463, 464.  Dr. Lion rated her as moderately impaired in her activities of daily living, and markedly impaired in her abilities to maintain social functioning and to maintain concentration, persistence, or pace. Tr. 466.  He also stated that she had experienced four or more episodes of decompensation within a twelve-month period, each of which lasted at least two weeks duration.  Id.  He opined that Plaintiff's impairments or treatment would cause her to miss more than four days of work per month.  Id.

In the section asking for clinical findings demonstrating the severity of Plaintiff's impairment, Dr. Lion cited her recent Zung depression scale score of 68 which he indicated meant she had at least moderate to severe depression.  Tr. 462.  He added that her mood was sometimes "severe down," but she had no suicide plan, no hallucination, and no delusion on her treatment now.  Id.  He indicated that he would "follow-up the Rx efficacy" which I understand to mean that Dr. Lion or Dr. Song would follow-up and determine if the recently increased dose of Prozac was effective.  In the section for additional reasons as to why Plaintiff would have difficulty working at a regular job on a sustained basis, Dr. Lion remarked that she had uncontrolled depression and chronic pain which was not controlled.  Tr. 467.

16 - OPINION & ORDER

Dr. Song saw Plaintiff on April 27, 2010. Tr. 480. He continued her medications and completed the medical marijuana forms. Id. The next time Plaintiff saw Dr. Song was on July 1, 2010 when she complained of left arm pain. Tr. 477. After that, it appears that she did not return to see either Dr. Lion or Dr. Song until March 2011 when she saw Dr. Song and reported that her depression and insomnia were not well controlled. Tr. 478. She did not complain about her back pain. Id. Curiously, although in March 2010 Dr. Song indicated that he was increasing Plaintiff's Prozac dose from 40 to 60 milligrams per day, the March 2011 chart note states that she was taking 20 milligrams of Prozac, twice per day, for a total of 40 milligrams per day. Id. He again stated he was going to increase the dose to 60 milligrams per day. Id. He also increased her Trazodone. Id.

The record shows that between April 2011 and September 2011, Plaintiff saw Dr. Song three times. Tr. 473-75, 529-30. She continued to complain of chronic back pain and Dr. Song kept her on her current pain relief regimen. Id. He also recommended that she do as much physical activity as possible outside to relieve some of her pain and to help with her anxiety and sleep. Id.

In assessing her physical RFC, the ALJ gave credit to the assessments of the nonexamining state agency medical consultants who opined that Plaintiff remained able to perform light work. Tr. 24 (citing Tr. 421-28, 468). He found these assessments to be consistent with the longitudinal record and with each other. Id. In contrast, the ALJ gave less weight to the opinions of her family physicians because their assessments of severe limitation were inconsistent with the objective findings which indicated only mild degenerative disc disease. Id. The ALJ had previously discussed the objective evidence, including x-rays, physical therapy

notes suggesting improvement, and MRIs.  Tr. 22.

As to her mental RFC, the ALJ also gave little weight to Plaintiff's treating physicians' opinions that Plaintiff is unable to meet competitive standards in her mental abilities and aptitudes to perform unskilled work.  Tr. 24.  The ALJ first noted that neither of the physicians was a specialist and there was no evidence that they possessed the relevant expertise to accurately evaluate the Plaintiff's mental impairments.  Id.  Second, the ALJ found that there was no support for their opinions.  Nonetheless, the ALJ gave "some weight" to their opinions over the opinion of examining psychologist Gail Wahl, Ph.D., who opined that Plaintiff had no functional limitations.  Id.

Plaintiff argues that the ALJ erred in rejecting the opinions of Dr. Song and Dr. Lion. She contends that the ALJ's reasoning does not meet the required standard for rejection of treating physician opinions.  She further contends that their opinions are supported by the longitudinal medical record and that the ALJ ignored the "concept" that her combination of physical impairments and depression yields more severe results than either impairment considered separately.

Social security law recognizes three types of physicians:  (1) treating, (2) examining, and (3) nonexamining.  Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant.  Id.; 20 C.F.R. §§ 1527(c)(1)-(2), 416.927(c)(1)-(2).

If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the

18 - OPINION & ORDER

treating physician's opinion is given controlling weight.  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Holohan, 246 F.3d at 1202.  If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. §§ 1527(d)(2), 416.927(d)(2).  Orn, 495 F.3d at 631.

If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons.  Id. at 632.  Even if the treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" which are supported by substantial evidence in the record.  Id.

Plaintiff argues that the ALJ was required to provide clear and convincing reasons to reject the treating physicians' opinions because they were contradicted only by a nonexamining physician, at least as to the physical RFC, which according to Plaintiff is not substantial evidence capable of creating a contradictory opinion.  Plaintiff is mistaken.  See Widmark v. Barnhart, 454 F.3d 1063, 1066 & n.2 (9th Cir. 2006) (holding that ALJ had to provide specific, legitimate reasons supported by substantial evidence in the record to reject the treating physician's opinion which was contradicted by the opinion of a nonexamining disability determination services physician; further noting that although the opinion of a nonexamining physician "alone cannot constitute substantial evidence for rejecting" a treating physician's opinion, the nonexamining physician's opinion "may suffice to establish a conflict among the medical opinions").  Thus, the ALJ was required to provide specific, legitimate reasons in support of his rejection of the opinions of Dr. Song and Dr. Lion.

The ALJ may reject a treating physician's opinion when it is unsupported by objective medical findings. Batson v. Comm'r, 359 F.3d 1190, 1195 (9th Cir. 2004). As the ALJ noted here, Plaintiff's x-rays and MRIs indicated only mild degenerative changes in her back. Additionally, as the record, recited in detail above, shows, at the time Dr. Song and Dr. Lion made their assessments in March and April 2010, Plaintiff had made progress in physical therapy. E.g., e.g., Tr. 363 (physical therapist noted slow progress and lumbar range of motion improvement; April 8, 2009); Tr. 347 (back continued to improve, albeit slowly; May 4, 2009); Tr. 345 (plaintiff reported more rapid progress with physical therapy; May 5, 2009); Tr. 301 (normal strength as measured by physical therapist in July 2009); Tr. 436 (reported that pool therapy had been beneficial; February 2010).

Other objective evidence shows her continued improvement. Compare Tr. 393 (positive leg raises on February 20, 2009) with Tr. 432 (negative straight leg raise, improving hamstring flexibility as reported by Dr. Lion on March 11, 2010); compare Tr. 378 (antalgic gait on March 4, 2009) with Tr. 436 (normal gait as reported by Dr. Lion on February 10, 2010); see also Tr. 309 (no loss of muscle strength, ambulation with hesitant gait on December 14, 2009).

Although Plaintiff's subjective reports varied and at times she complained of increasing pain and symptoms, the ALJ did not err by concluding that the objective medical evidence and longitudinal record is inconsistent with the severe restrictions opined by Dr. Lion and Dr. Song.[1]

---

[1] Additionally, PA Farrar noted in May 2009 that Plaintiff's MRIs, x-rays, and neurology consult did not indicate "anything that supports disability." Tr. 349. While a PA is classified as an "other source" 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1), meaning the PA's opinion is not entitled to the same deference as a medically acceptable treating source, this is at least additional evidence in the record of a trained medical professional's opinion that the objective medical evidence did not support, at least as of May 2009, restrictions consistent with a determination of disability.

Given that this is a specific, legitimate reason supported by substantial evidence in the record, the ALJ did not err in rejecting the physical capacities assessments provided by Plaintiff's treating physicians.

As to her mental impairments, the ALJ was entitled to give her treating physicians' opinions less weight because they are generalists and not specialists. See Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (opinions from specialists related to that person's speciality are afforded more weight); 20 C.F.R. §§ 404.1527(d)(5) (agency generally gives more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist); 416.927(c)(5) (same).

As for the lack of support for the treating physicians' opinions regarding Plaintiff's mental functional capacities, the record reflects that Plaintiff's depression improved with medication. E.g., Tr. 356 (reporting improvement of depression with Prozac on April 10, 2009); Tr. 309 (Dr. Song noting in December 2009 that Plaintiff's depression had improved on an increased dose of Prozac and was now controlled); Tr. 437 (Plaintiff reported to Dr. Lion on March 1, 2010 that she felt a little better in regard to her depression); Tr. 432 (Plaintiff reported to Dr. Lion on March 26, 2010 that while the denial of her disability application contributed to her depression, she believed her depression medications were still helpful). Despite the record of improvement, Dr. Song remarked at the end of March 2010 that Plaintiff's depression was uncontrolled. Tr. 431. This was based, however, not on any objective diagnostic test but on a self-rated scoring sheet, that is, a subjective report of symptoms. Id. Importantly, Dr. Song increased Plaintiff's Prozac and there are no records of the status of her depression between the time that the dose was increased and the time that Dr. Song and Dr. Lion completed their functional assessments of

Plaintiff.  In fact, Dr. Lion's April 19, 2010 assessment notes that he would follow-up on the

"efficacy" of her prescription.  Tr. 462.

Finally, the record does not support the treating physicians' assessments in regard to

Plaintiff having experienced repeated episodes of decompensation, each of extended duration as

defined by the relevant regulations.  "Episodes of decompensation" are

> exacerbations or temporary increases in symptoms or signs accompanied by a loss
> of adaptive functioning, as manifested by difficulties in performing activities of
> daily living, maintaining social relationships, or maintaining concentration,
> persistence, or pace.  Episodes of decompensation may be demonstrated by an
> exacerbation in symptoms or signs that would ordinarily require increased
> treatment or a less stressful situation (or a combination of the two).  Episodes of
> decompensation may be inferred from medical records showing significant
> alteration in medication; or documentation of the need for a more structured
> psychological support system (e.g. hospitalizations, placement in a halfway house,
> or a highly structured and directing household); or other relevant information in
> the record about the existence, severity, and duration of the episode.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C4.  "Repeated episodes of decompensation, each of

extended duration" means "three episodes within 1 year, or an average of once every 4 months,

each lasting for at least 2 weeks."  Id.

Dr. Lion's and Dr. Song's March 2010 mental functional capacity assessments indicate a

lack of understanding regarding the "episodes of decompensation" criterion.  Both opined that

Plaintiff had "marked" limitations in episodes of decompensation, but the regulations make clear

that episodes of decompensation are characterized as either none, one or two, three, or four or

more.  20 C.F.R. §§ 404.1520a(c)(4), 916.920a(c)(4).

The assessment they provided in April 2010 used the correct characterization, assessing

Plaintiff as having had four or more episodes of decompensation within a twelve-month period,

each of which was at least two weeks duration.  Tr. 466.  As indicated, the record shows that Dr.

22 - OPINION & ORDER

Song increased Plaintiff's Prozac on two occasions - once in December 2009 and another in late March 2010.  Even assuming these were "significant" increases in medication sufficient to establish them as episodes of decompensation, there were only two, not three or four or more in a twelve-month period.  And while the record suggests that Plaintiff's depression may have impacted her performance of activities of daily living, her maintenance of social relationships, or her maintaining concentration, persistence, or pace, the record does not support that these amounted to "episodes of decompensation" requiring an increase in treatment or other intervention, other than the two instances of increased Prozac dosage.

Even without an objective record supporting the treating physicians' mental residual functional capacity assessments, the ALJ still gave some weight to their opinions, consistent with what the ALJ concluded the record allowed.  Thus, the ALJ restricted Plaintiff to "simple, routine, repetitive work involving only simple work-related decisions and routine workplace changes." Tr. 21.  He also allowed that she would be "off-task five minutes out of each hour" and limited her to a "stress level of no more than eight on a scale of one to ten." Id.

The ALJ provided specific and legitimate reasons for discounting the mental residual functional capacity assessments of Dr. Lion and Dr. Song.  The ALJ accounted for the limitations supported by the record.

Plaintiff argues that the ALJ erred by not considering the combined effect of her physical and mental impairments.  In support, she cites Lester, 81 F.3d at 829-30.  There, the court considered the ALJ's responsibility at step three in determining whether the claimant has a listed impairment and concluded that because the consequences of the Lester claimant's physical and mental impairments were "inextricably linked," the Commissioner was required to consider

whether those impairments "*taken together* result in limitations equal in severity to those specified by the listings." Id. at 829-30. Lester does not support Plaintiff's argument that in determining Plaintiff's functional limitations at step four, the ALJ is required to consider the combined effects of a claimant's impairments.

Moreover, given that Plaintiff's treating practitioners stated that Plaintiff's physical and psychological impairments went "hand in hand," their assessments of her limitations presumably accounted for the combined effect of her impairments. Nonetheless, the ALJ gave specific and legitimate reasons supported by substantial evidence in the record in rejecting some or all of their functional limitations. Nothing more was required.

II.  Medication Side Effects

Plaintiff argues that the ALJ erred because he failed to take into account side effects of her medications which affect her functional abilities. The ALJ must consider medication side effects in the disability determination process because, like pain and other symptoms, side effects can significantly impact an individual's ability to work. Varney v. Sec'y of Health and Human Servs., 846 F.2d 581, 585 (9th Cir. 1988).

In July 2009, Plaintiff told Dr. Song that Percocet upset her stomach. Tr. 304. He substituted other medications in its place. Id. In March 2010, she told Dr. Lyon that tramadol was making her feel "somewhat altered" and sleepy. Tr. 433. He substituted a different medication in its place. Id. These are the only references I could find in the chart notes of Plaintiff complaining about a medication side effect.

Nonetheless, in their April 19, 2010 assessment of Plaintiff's limitations, her treating physicians opined that oxycodone made Plaintiff dizzy, and that Prozac and Trazodone made her

drowsy and tired.  But, as the ALJ noted, Plaintiff reported in several disability-related

documents that these medications caused no side effects.  Tr. 23 (citing Tr. 189 (listing several

medications prescribed by Dunes Family Healthcare including Prozac and Trazadone and listing

"none" for each one in response to the question of whether the medication caused any side

effects); Tr. 201 (same, but list included oxycodone as well); Tr. 195 (same, except column for

side effects is left blank rather than completed with the word "none"; medications included

Prozac, Trazadone, and oxycodone)); see also Tr. 260-61 (Aug. 2010 report in which Plaintiff

listed "none" for side effects of Prozac, Trazadone, and oxycodone).  Plaintiff's hearing testimony

was also equivocal in that when asked if she had any side effects from medications, she

responded:  "I don't know, like I said my attention span is not real good anymore.  I'm gaining

weight I imagine, I don't know if that's contributed to the pills, depression or what."  Tr. 48.

        The record supports the ALJ's conclusion that Plaintiff uses a number of medications

without reported side effects.  The ALJ did not err in refusing to consider medication side effects

in his RFC.

III.  Lay Witness Testimony

        Plaintiff's friend Christina Branson submitted a written Function Report dated January 2,

2010.  Tr. 228-35.  There, Branson described (1) Plaintiff's daily activities, (2) how Plaintiff's

injuries or conditions affect her, (3) what Plaintiff can do in regard to personal care, meals,

housework, yard work, getting around, and shopping, (4) whether Plaintiff can handle money, (5)

Plaintiff's hobbies and interests, (6) Plaintiff's social activities, and (7) other information about

Plaintiff's abilities.  Id.  Generally, she described Plaintiff as being severely limited in her

activities because of her pain, although she did note that Plaintiff goes to town for doctor visits

and grocery shopping.  Id.; Tr. 230.

The ALJ discussed Branson's testimony and concluded that it did not establish Plaintiff's

disability and was instead consistent with the RFC reached by the ALJ.  Tr. 24-25.  Specifically,

he noted that the accuracy of her statements was questionable because as a lay person, she was

not medically trained to make "exacting observations as to dates, frequencies, types and degrees

of medical signs and symptoms, or of the frequency or intensity of unusual moods or

mannerisms[.]"  Tr. 25.  Second, he stated that because her report was based only on her

observation, it may not be accurate regarding Plaintiff's maximal capacities.  Id.  Third, he

discounted the accuracy of her report because of her close relationship with Plaintiff.  Id.  Fourth,

and what the ALJ indicated was "most important[]," the ALJ did not give great weight to

Branson's testimony because, like Plaintiff's statements, it was inconsistent with the medical

opinions and other evidence.  Id.

An ALJ must give reasons "germane to the witness" when discounting the testimony of

lay witnesses.  Valentine, 574 F.3d at 694.  Only one germane reason is necessary to support the

rejection of a lay witness's testimony, even if other reasons are invalid.  Id. (ALJ's error in

considering wife's relationship as reason for rejecting her statement was harmless because

remaining reasons were valid).

Disregarding the ALJ's reasons based on Branson's lack of medical training and the

closeness of her relationship with Plaintiff, the ALJ's rejection of Branson's testimony is still

supported by the reason he designated as "most important":  inconsistency with the medical

opinions and other evidence.  The ALJ had already spent several pages of his opinion discussing

why he discounted Plaintiff's subjective complaints.  Tr. 22-25.  Among the reasons given were

26 - OPINION & ORDER

that Plaintiff's subjective testimony was not supported by the objective medical evidence, was

inconsistent with her treatment history, and was inconsistent with her activities of daily living.

Tr. 22-24.  Notably, Plaintiff does not challenge the ALJ's credibility determination in this

appeal.  When the ALJ rejected Branson's statements, because, "like the claimant's," they were

unsupported by the medical opinions and other evidence he previously discussed, the ALJ

rejected Branson's statements because they were not supported by the objective medical

evidence, were inconsistent with Plaintiff's treatment history, and were inconsistent with

Plaintiff's activities of daily living.  These are reasons germane to the witness and are supported

by the record as described above.  The ALJ did not err in rejecting Branson's testimony.

CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this _____ day of _____, 2014

Marco A. Hernandez
United States District Judge

27 - OPINION & ORDER